# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| STEPHEN CORT, on Behalf of Himself and all Others Similarly Situated, | ) ) ) |
|  | )**CASE NO.** |
| Plaintiff, | ) |
|  | ) **1 03 CV00591** |
| vs. | )**CLASS ACTION COMPLAINT** )**FOR VIOLATIONS OF** )**FEDERAL SECURITIES LAWS** |
| LABORATORY CORPORATION OF AMERICA HOLDINGS, THOMAS MACMAHON, RICHARD L. NOVAK and WESLEY ELINGBURG, | ) ) )**JURY TRIAL DEMANDED** |
| Defendants. | ) |

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Laboratory Corporation of America Holdings ("LabCorp" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1. This is a federal class action on behalf of purchasers of the securities of LabCorp between February 13, 2002 to October 3, 2002, inclusive (the "Class Period"), who suffered damages thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. LabCorp is a Burlington-based independent laboratory, offering over 4,000 clinical medical tests used to diagnose, monitor, treat and test patients. LabCorp operates

nationally through 47 primary laboratories. In 1997, the Company announced a strategic plan to increasingly incorporate genomic testing into its business. The Company pursued this goal largely through corporate acquisitions, buying companies that specialize in the genomics field.

3.      Throughout the Class Period, the Company issued quarterly press releases and filed reports with the SEC which represented that the Company's business was strong and growing, that its strategic initiative to increase its genomic testing business was proceeding successfully, and specifically allayed investor concerns concerning weakened sales-volume growth after such concerns were raised in the second quarter of 2002 by representing that such issues had been resolved. These, and other statements particularized below, were materially false and misleading when made because they failed to disclose that the Company was experiencing increased competition in its traditionally strongest markets and was suffering from material, company-specific sales-force problems, such as a decline in service levels, leading to lost sales.

4.      Defendants engaged in the conduct alleged herein in order to allow LabCorp insiders to sell their personally held LabCorp common stock at artificially inflated prices. Throughout the Class Period, LabCorp insiders, including defendants MacMahon, Elingburg and Novak sold a total of 316,112 shares of LabCorp common stock at artificially inflated prices, grossing a total of over $26 million. As detailed below, the amounts sold by all of the insiders, including each of the Individual Defendants, represented material amounts of their overall holdings of LabCorp stock and options. Defendants were further motivated to engage in the conduct alleged herein so that LabCorp could use its inflated stock as currency for the strategically important corporate acquisitions of Dynacare, Inc., which the Company announced in May 2002 and which it paid for with a combination of a stock-for-stock exchange, cash and

- 2 -

assumed debt. Had the truth concerning the Company's serious problems been made public, the exchange ratio would have been less favorable to the Company and would have jeopardized LabCorp's ability to secure the requisite shareholder votes from its, and Dynacare's, shareholders.

5.      On October 3, 2002, after the close of regular trading, LabCorp shocked the market by revealing that due to the negative impact from a "continued slowdown in volume growth in the routine, or core, testing business in certain key regions of the country," the Company's results in the third quarter would be less than the Company had previously led the market to believe. The Company further stated that the negative impact is expected to last through the remainder of 2002.

6.      Investors, primed by defendants' Class Period statements to believe that the Company's business was growing faster than ever, and that the volume issues announced in the second quarter had been minor and had been resolved, were shocked to learn of the "continued slowdown" in the Company's core business. In reaction to the Company's belated disclosure, the price of LabCorp common stock plummeted, falling 34.6% in one day, from a close of $33.18 per share on October 3, 2002 to $21.68 per share on October 4, 2002, on trading volume of over 21.2 million shares, which is many times the Company's average daily trading volume.

7.      In a conference call held after the release of the Company's third quarter results, on October 30, 2002, defendant MacMahon further disclosed that the "volume problem" stemmed from inadequate personnel levels and distribution in its core markets, which the Company began to address in July 2002.

Case 1:03-cv-00591-JAB   Document 1   Filed 06/24/03   Page 3 of 33

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.   Additionally, the Company maintains its principal executive offices within this District.

## PARTIES

12.     Plaintiff, Stephen Cort, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of LabCorp at artificially inflated prices during the Class Period and has been damaged thereby.

13.     Defendant LabCorp is organized under the laws of Delaware and maintains its principal executive offices at 358 South Main Street, Burlington, NC 27215. LabCorp is an

- 4 -

independent laboratory, offering over 4,000 clinical laboratory tests used in the medical field.

14.     Defendant Thomas P. MacMahon ("MacMahon") was LabCorp's Chief Executive Officer, President and Chairman of the Board of Directors throughout the Class Period. During the Class Period, defendant MacMahon sold a total of 117,733 shares of the Company's common stock at artificially inflated prices, for gross proceeds of $10,307,970. The 117,733 shares sold by defendant MacMahon during the Class Period represented 34.3% of his total LabCorp stock and options.

15.     Defendant Wesley Elingburg ("Elingburg") was LabCorp's Chief Financial Officer, Executive Vice President and Treasurer throughout the Class Period. During the Class Period, defendant Elingburg sold a total of 47,978 shares of the Company's common stock at artificially inflated prices, for gross proceeds of $4,304,922. The 47,978 shares sold by defendant Elingburg during the Class Period represented 35.1% of his total LabCorp stock and options.

16.     Defendant Richard L. Novak was Labcorp's Chief Operating Officer throughout the Class Period. During the Class Period, defendant Novak sold a total of 27,000 shares of the Company's common stock at artificially inflated prices, for gross proceeds of $2,440,801. The 27,000 shares sold by defendant Novak during the Class Period represented 17.9% of his total LabCorp stock and options.

17.     Defendants MacMahon, Elinburg and Novak are referred to collectively herein as the "Individual Defendants".

18.     During the Class Period, each of the Individual Defendants, as senior executive officers and directors of LabCorp was privy to confidential and proprietary information concerning LabCorp, its operations, finances, financial condition, present and future business

- 5 -

prospects. The Individual Defendants also had access to material adverse non-public information concerning LabCorp, as discussed in detail below. Because of their positions with LabCorp, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19. Each of the defendants is liable as a direct participant in, and a co-conspirator with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of LabCorp's business.

20. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to

- 6 -

prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

21. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of LabCorp between February 13, 2002 to October 3, 2002, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LabCorp had approximately 147 million shares of common stock outstanding, which were actively traded on the New York Stock Exchange (the "NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by LabCorp or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

- 7 -

24. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

25. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of LabCorp; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

26. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Materially False And Misleading
Statements Made During The Class Period**

27. The Class Period begins on February 13, 2002. On that day, LabCorp issued a press release announcing its results for the fourth quarter and full year ended December 31, 2001. For the year, LabCorp reported net sales of $2,199.8 million, operating income of $367.6

- 8 -

million, and pro forma net income of $187.7 million, before an extraordinary item and one-time charge. Defendant MacMahon stated as follows regarding the reported results:

> "LabCorp's strong fourth quarter performance rounded out an impressive year of price and volume gains for the Company," said Thomas P. Mac Mahon, chairman and chief executive officer. "We achieved steady growth and exceeded our performance measures for each quarter. Our significant accomplishments include further expansion of our managed care business while strengthening our scientific expertise and market share through acquisitions and strategic partnerships. With approximately $150 million of cash on hand, we are well positioned to pursue additional opportunities through a variety of approaches going forward."

28.     On March 18, 2002, LabCorp filed its Form 10-K for the 2001 year with the SEC. The Form 10-K was signed by defendant MacMahon and reiterated the financial information contained in the February 12 press release. In the section of the Form 10-K titled Management's Discussion and Analysis of Financial Condition and Results of Operations, the Company represented that strong growth would continue, identifying the following items as growth-drivers:

> In addition to the acquisitions and relationships discussed above, the Company believes future performance will be positively affected by several factors: 1) The expansion of higher-value genomic tests such as Cystic Fibrosis, HCV and HIV genotyping is occurring, along with the continued growth of HIV viral loads and HPV testing; 2) Continued conversion of traditional pap smears to the newer, high value monolayer technology; 3) Additional product licensing and business relationships (such as Myriad Genetics and Exact Sciences); 4) The Company's ongoing business acquisition strategy; 5) Growing demand for genomic testing will create a positive shift in test mix to higher value testing; and 6) Improving regulatory and reimbursement environment in Washington.

29.     The statements referenced above in ¶¶ 26-28, above, were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, which were known to, or, at the very least, recklessly disregarded by defendants:

(a)     that LabCorp had begun to experience increased competition from the

- 9 -

Company's historical levels in its core markets, including the Carolinas;

   (b)  the Company had understaffed certain of its core markets, leading to a lack of key employees, such as phlebotomists and account representatives, which led to a material deterioration of service levels and a loss of business to increased competition; and

   (c)  as a result of the foregoing, the Company's assurance that its historical strong growth would continue lacked any reasonable basis when made and its non-disclosure of known negative trends due to Company-specific operating deficiencies was materially false and misleading.

  30.  On April 22, 2002, LabCorp issued a press release announcing its results for the first quarter of 2002, ended March 31, 2002. Net sales for the quarter were reportedly $590 million, while operating and net income was reportedly $116.4 and $65.8 million, respectively. The reported results represented double digit percentage growth over the first quarter of 2001. Attributing the results to LabCorp's supposedly "successful implementation" of the strategic plan, defendant MacMahon commented as follows:

> "Our strong financial performance has been driven by the successful implementation of our strategic plan, with particular emphasis on molecular and other esoteric tests, which now represent approximately 23 percent of our revenues," said Mr. Mac Mahon. "Our cash generation is substantial, enabling us the flexibility to selectively focus on those strategies that best position us for long-term sustained growth. We continue to evaluate a variety of opportunities for appropriate uses of our funds, such as acquisitions, introducing new tests, new licensing partnerships and making strategic capital investments to facilitate our

- 10 -

continued market expansion."

The press release also announced that a two-for-one stock split of the Company's common stock would take effect May 13, 2002.

31.     On May 9, 2002, LabCorp announced in a press release that it had entered into a definitive agreement to acquire Dynacare Inc., a Dallas-based independent laboratory, for approximately $480 million in stock and cash plus the assumption of $205 million in debt. The deal was consummated on July 25, 2002, with each Dynacare shareholder receiving 0.2328 shares of LabCorp common stock plus $11.50 cash for each tendered Dynacare share.

32.     On July 24, 2002, the Company issued a press release announcing its results for the second quarter of 2002, as follows:

> Net sales were $612.4 million, operating income was $134.1 million, and net income was $78.5 million. This compares with net sales of $549.7 million, operating income of $102.6 million, and net income of $52.1 million in the second quarter of 2001. Diluted earnings per share for the quarter were $0.55, versus $0.37 for the same quarter in 2001. The 11.4 percent increase in net sales is the result of increases of approximately 7.0 percent in volume and 4.4 percent in price.

In the press release, defendant MacMahon touted the Company's performance and, in addition, characterized the pending Dynacare acquisition as instrumental to its overall strategy, as follows:

> "LabCorp has once again achieved industry-leading profitability as we continue to expand our national network and genomic and esoteric testing businesses," said Thomas P. Mac Mahon, chairman and chief executive officer. "During the quarter, we announced our acquisition of Dynacare Inc., which is expected to close tomorrow. This transaction provides significant growth opportunities in selected U.S. markets and as much as $45 million in synergy savings within three years. Additionally, we began offering Myriad Genetic's predisposition assays for certain cancers and cardiac risk and announced an exclusive agreement with EXACT Sciences to offer a noninvasive screening test for colorectal cancer. Each of these important accomplishments demonstrate LabCorp's strategy to further expand our genomic testing capabilities and national infrastructure is working, and will help ensure growth in revenues and profits in coming years."

- 11 -

33.     The following day, on July 25, 2002, the Company held its second quarter of 2002 conference call for investors and analysts. A transcript of the call was made available to the public over the Fair Disclosure Wire. Defendant MacMahon reiterated the importance of the Dynacare acquisition, which had closed that day, stating as follows:

We are extremely excited by the Dynacare opportunity.

It directly supports our strategic objectives of strengthening our national presence by expanding our geographic reach, which allows us to expand our leading position in the introduction of commercialization of genomic tests. Dynacare's network is a top-dollar strategic fit for LabCorp with numerous opportunities to optimize operating efficiencies and expand patient access to our network and expenses menu. In terms of geographic regions, Dynacare operates in geographic areas where we have often mentioned we want to be. . . . We are acquiring all the stock of Dynacare for $11.50 in cash and 0.2328 shares of LabCorp's stock for each share of Dynacare stock. We are financing the transaction by issuing approximately 4.9 million shares of LabCorp common stock, and using $260 million in cash. . . .

34.     With respect to the second quarter results, defendant MacMahon stated that sales volume were negatively impacted during the quarter, but (falsely) minimized the issue by attributing it to a non-operating problem that, in any event, had been largely solved, namely, the Company's delay in finalizing a large deal with, among others, Premier Inc. In addition, MacMahon failed to disclose that the problems were in the Company's core markets, such as the Carolinas, stating as follows in relevant part:

- 12 -

BILL BONELLO, ANALYST, WACHOVIA SECURITIES: Yes, just a couple of follow-up questions. Can you give a little bit more detail? You mentioned volume growth slowed in certain markets. Can you give a little bit more explanation on why you think that was, and what if anything you might be able to do to rectify that aside from the contract opportunities, but is there anything executional?

THOMAS P. MAC MAHON: Sure Bill. Double reason for disproportional impact that we consider are our inability to finalize several long big deals that really are essential part of our growth plans. In addition, we had some smaller wave of providers in these regions, which quite honestly are pretty effective. Now what have we done? We have redoubled our efforts to get the big deals done, and Premier is a good example. . .

***

*I guess my answer is that Bill, there were some regions that were disproportionally impacted by our inability to finalize the Premier deal as well as some other big deals.* The fact that there were some smaller labs out there that really hurt us in several regions of the country. Now what are we going to do about that? *The first thing we are going to do when we begin is we have got the Premier deal done.* That does impact in certain regions in a greater way than other regions. We are putting great emphasis in getting some of these other deals done. Secondly we had developed plans to more effectively compete with these smaller lab providers, which include highlighting the advantages of our genomic strategy, differentiating ourselves in the esoteric area, and developing plans to be more effective from a sales perspective in a couple of these regions. [Emphasis added].

Defendant MacMahon also represented that sales volume would increase over the next six

months, stating as follows:

We also now are beginning in integration [SIC] of Dynacare. That's a major acquisition to this company. This company has experience in these kinds of integration processes. During a lot of our integration processes we have always been the leader in profitability in this industry. *This company has continued to deliver tremendous profitability and we will continue to do so. So when I look at what is ahead for us over the next six months I look at strong pricing, I look at continued volume increases, I look at the integration of Dynacare, and I look at the most recent information that I have.* I look at our standards compared to everything else that is going on in the industry, and I think it's a pretty good accomplishment.[Emphasis added].

- 13 -

35.     The statements referenced in ¶¶ 30, 32-34, above, were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, which were known to, or, at the very least, recklessly disregarded by defendants:

(a)     that LabCorp had was experiencing increased competition in its traditionally strongest and core markets, such as the Carolinas;

(b)     the Company had understaffed certain of its core markets, leading to a lack of key employees, such as phlebotomists and account representatives, causing a material deterioration of service levels and a loss of business to increased competition;

(c)     the decreased sale volume was caused by material operational deficiencies, rather than by a couple of pending deals that closed late, as defendant MacMahon had represented;

(d)     that defendants knew that the Company's sales issues would continue in the foreseeable future, contrary to defendant MacMahon's statement that volume growth would increase; and

(e)     as a result of the foregoing, the Company's assurance that its historical strong growth would continue lacked any reasonable basis.

### The Truth Emerges

36.     On October 3, 2002, after the close of regular trading, LabCorp shocked the market by announcing that it expects disappointing third quarter of 2002 results, due to "continued slowdown in volume growth in the routine, or core, testing business in certain key regions of the country," which it expected would continue at least until the end of 2002. The Company further stated as follows regarding the matter:

- 14 -

LabCorp said that the less than anticipated quarterly revenue growth is directly related to a continued slowdown in volume growth in the routine, or core, testing business in certain key regions of the country. LabCorp noted, based upon its preliminary review, that testing volume growth in its strategically important genomics business continued to be strong. The Company also emphasized that it remains committed to its strategic plan focusing on genomic testing, and continues to be optimistic about its prospects for overall growth and profitability.

As a result of the revised revenue estimates, the Company expects that third quarter diluted earnings per share (EPS) will now be approximately 10 percent lower than the First Call consensus estimate of $0.49. Although LabCorp has implemented a series of programs to increase revenue growth in the regions affected, it believes this trend will most likely continue throughout the fourth quarter and, accordingly, will provide updated guidance for the fourth quarter of 2002 during its quarterly earnings call scheduled for October 31, 2002 at 9 a.m. (Eastern Time).

37.     Investors, primed by defendants' Class Period statements to believe that the Company's business was growing faster than ever, and had already overcome the brief slowdown in growth during the second quarter (as per the Company's statements), were shocked to learn that the slowdown had continued and was not expected to abate until after the end of the year and that the slowdown had been in the Company's core business. In reaction to the Company's belated disclosure, the price of LabCorp common stock plummeted, falling 34.6% in one day, from a close of $33.18 per share on October 3 to $21.68 per share on October 4, on trading volume of over 21.2 million shares, which is many times the Company's average daily trading volume.

38.     The Company announced its third quarter and nine months of 2002 results on October 30, 2002, reporting the following results:

> Revenues in the third quarter were $655.2 million, an increase of 16.8 percent compared to the same period in 2001, and reflect the acquisition of Dynacare Inc. on July 25, 2002. Testing volume, measured by accessions, increased 13.2 percent compared to the

- 15 -

prior year, or 4.3 percent on a pro forma basis, assuming that Dynacare had been part of LabCorp since January 1, 2001. Price per accession increased 3.6 percent compared to third quarter 2001.

Net income for the quarter increased to $67.5 million, or $0.46 per diluted share, compared to 2001 third quarter net income of $51.2 million, or $0.41 per diluted share, before special items in both periods and adjusted for the required change in goodwill accounting (SFAS 142) and the special items.

\*\*\*

For the nine-month period ended September 30, 2002, revenues were $1,857.6 million, an increase of 13.5 percent compared to the same period in 2001, and reflect the acquisition of Dynacare on July 25, 2002.

39.     In a conference call held after the release of the Company's third quarter results, on October 30, 2002, a transcript of which was made available by <u>Fair Disclosure Wire</u>, defendant MacMahon revealed that the "volume problem" stemmed from inadequate personnel levels and distribution capacities, which the Company began to address in July 2002:

First, and I think foremost on many people's minds, is what are you doing to address the volume problem in certain affected regions. I'd like to first point out that our third quarter revenue came in only 1.4 percent below the original first quarter consensus revenue estimate, and LabCorp continues to deliver industry-leading margins. Since pre-announcing results about three weeks ago, we at LabCorp have spoken to several hundred investors and the major focus of these discussions has been how we intend to deal with [excession] (ph) volume in the affected regions. As discussed we have begun as early as late July and in August a reinvestment program which includes adding individuals to service our customers and expanding our distribution capabilities. This deals with the situation [inaudible] to account managers, to phlebotomists and to making sure we have enough sales coverage in the areas. This reinvestment had a negative impact on expenses on the quarter and will most likely continue into the fourth quarter.

- 16 -

## ADDITIONAL SCIENTER ALLEGATIONS

40.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding LabCorp, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LabCorp, participated in the fraudulent scheme alleged herein.

41.     The Individual Defendants were motivated to commit the fraud alleged herein so that Company insiders could sell their personally held shares of LabCorp common stock at prices higher than if the truth about the Company's business was known. During the Class Period, LabCorp insiders sold a total of 316,112 shares of LabCorp common stock at artificially inflated prices, reaping total gross proceeds in excess of $26 million (per share amounts reflect pre-split prices; percentages are calculated based on total holdings as of the date of the seller's first Class Period sale), as follows:

Wesley R. Elinburg, Chief Financial Officer:

| DATE | # OF SHARES | PRICE PER SHARE | TOTAL VALUE |
|------|-------------|-----------------|-------------|
| 2/15/02 | 100 | 87.01 | $8,701.00 |

- 17 -

| DATE | # OF SHARES | PRICE PER SHARE | TOTAL VALUE |
|------|-------------|-----------------|-------------|
| 2/15/02 | 1,900 | 86.85 | $165,015.00 |
| 2/15/02 | 3,000 | 87.08 | $261,240.00 |
| 2/15/02 | 3,600 | 87 | $313,200.00 |
| 3/14/02 | 2,000 | 90.03 | $180,060.00 |
| 3/14/03 | 4,200 | 90.08 | $378,336.00 |
| 3/14/03 | 6,178 | 90 | $556,020.00 |
| 3/15/02 | 5,000 | 91 | $455,000.00 |
| 3/15/02 | 5,000 | 90.4 | $452,000.00 |
| 3/15/02 | 5,000 | 90.2 | $451,000.00 |
| 3/15/02 | 5,000 | 89.82 | $449,100.00 |
| 3/15/02 | 7,000 | 90.75 | $635,250.00 |

<u>Myla P. Lai-Goldman, Executive Vice President</u>:

| DATE | # OF SHARES | PRICE PER SHARE | TOTAL VALUE |
|------|-------------|-----------------|-------------|
| 2/27/02 | 4,800 | 82 | $393,596.16 |

- 18 -

| 2/27/02 | 10,000 | 81.95 | $819,500.00 |
| 3/15/02 | 3,000 | 90.01 | $270,030.00 |
| 3/15/02 | 3,000 | 91 | $273,000.00 |
| 3/15/02 | 3,000 | 90.2 | $270,600.00 |
| 3/15/02 | 8,000 | 90.4 | $723,200.00 |
| ███████ | ███████ | ███████ | ███████ |

Thomas P. MacMahon, Chief Executive Officer:

| DATE | # OF SHARES | PRICE PER SHARE | TOTAL VALUE |
| --- | --- | --- | --- |
| 3/01/02 | 2,733 | 81.23 | $222,001.59 |
| 3/01/02 | 3,400 | 81.41 | $276,794.00 |
| 3/01/02 | 5,000 | 81.45 | $407,250.00 |
| 3/01/02 | 5,000 | 81.35 | $406,750.00 |
| 3/01/02 | 5,000 | 81.3 | $406,500.00 |
| 3/01/02 | 5,400 | 81.4 | $439,560.00 |
| 3/15/02 | 300 | 90.27 | $27,081.00 |

- 19 -

| 3/15/02 | 1,300 | 90.3 | $117,390.00 |
| 3/15/02 | 1,600 | 90 | $144,000.00 |
| 3/15/02 | 1,600 | 89.88 | $143,808.00 |
| 3/15/02 | 6,800 | 90.05 | $612,340.00 |
| 3/15/02 | 10,000 | 91 | $910,000.00 |
| 3/15/02 | 28,300 | 90.4 | $2,558,320.00 |
| 3/18/02 | 5,000 | 91 | $455,000.00 |
| 3/18/02 | 5,000 | 90.42 | $452,100.00 |
| 3/18/02 | 5,000 | 90.05 | $450,250.00 |
| 3/18/02 | 5,000 | 90 | $450,000.00 |
| 3/18/02 | 10,000 | 90.7 | $907,000.00 |

Bradford T. Smith, Executive Vice President:

| DATE | # OF SHARES | PRICE PER SHARE | TOTAL VALUE |
|------|-------------|-----------------|-------------|
| 3/01/02 | 200 | 81.42 | $16,284.00 |

- 20 -

| | | | |
|---|---|---|---|
| 3/01/02 | 800 | 81.3 | $65,040.00 |
| 3/01/02 | 1,000 | 81.5 | $81,500.00 |
| 3/01/02 | 1,000 | 81.35 | $81,350.00 |
| 3/01/02 | 1,000 | 81.23 | $81,230.00 |
| 3/01/02 | 2,000 | 81.41 | $162,820.00 |
| 3/01/02 | 2,600 | 81.4 | $211,640.00 |
| 3/14/02 | 5,000 | 90.03 | $450,150.00 |
| 3/14/02 | 24,334 | 90 | $2,190,060.00 |
| 3/15/02 | 100 | 89.88 | $8,988.00 |
| 3/15/02 | 1,000 | 89.5 | $89,500.00 |
| 3/15/02 | 3,900 | 89.81 | $350,259.00 |
| 3/15/02 | 5,000 | 90.39 | $451,950.00 |
| 3/15/02 | 5,000 | 90.2 | $451,000.00 |
| 3/15/02 | 6,900 | 90.75 | $626,175.00 |

- 21 -

Richard L. Novak, Chief Operating Officer:

| DATE | # OF SHARES | PRICE PER SHARE | TOTAL VALUE |
|------|-------------|-----------------|-------------|
| 3/15/02 | 100 | 90.01 | $9,001.00 |
| 3/15/02 | 4,900 | 90 | $441,000.00 |
| 3/15/02 | 5,000 | 91 | $455,000.00 |
| 3/15/02 | 5,000 | 90.2 | $451,000.00 |
| 3/15/02 | 12,000 | 90.4 | $1,084,800.00 |

Stevan R. Stark, Executive Vice President:

| DATE | # OF SHARES | PRICE PER SHARE | TOTAL VALUE |
|------|-------------|-----------------|-------------|
| 4/02/02 | 400 | 95.76 | $38,304.00 |
| 4/02/02 | 800 | 95.24 | $76,192.00 |
| 4/02/02 | 1,700 | 95.18 | $161,806.00 |
| 4/02/02 | 2,500 | 96 | $240,000.00 |
| 4/02/02 | 4,600 | 95.5 | $439,300.00 |
| 4/02/02 | 7,700 | 95.86 | $738,122.00 |
| 4/19/02 | 14,067 | 100 | $1,406,700.00 |

- 22 -

## Undisclosed Adverse Information

42. The market for LabCorp's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, LabCorp common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued at least until October 3, 2002. Plaintiff and other members of the Class purchased or otherwise acquired LabCorp's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to LabCorp, and have been damaged thereby.

43. During the Class Period, defendants materially misled the investing public, thereby inflating the price of LabCorp common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

44. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about LabCorp's earnings. These material misstatements and omissions created in the market an unrealistically positive assessment of LabCorp and its prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant

- 23 -

times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus leading to their losses when the illusion was revealed, and the market was able to accurately value the Company.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

45. At all relevant times, the market for LabCorp's securities was an efficient market for the following reasons, among others:

(a) LabCorp's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, LabCorp filed periodic public reports with the SEC and the NYSE;

(c) LabCorp regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) LabCorp was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

46. As a result of the foregoing, the market for LabCorp's securities promptly digested

- 24 -

current information regarding LabCorp from all publicly available sources and reflected such information in LabCorp's stock price. Under these circumstances, all purchasers of LabCorp's securities during the Class Period suffered similar injury through their purchase of LabCorp's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

47.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of LabCorp who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

- 25 -

49. During the Class Period, LabCorp and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of LabCorp's securities; and (iii) cause Plaintiff and other members of the Class to purchase LabCorp's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

50. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LabCorp's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51. LabCorp and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of LabCorp as specified herein.

52. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of LabCorp's value and performance and continued substantial growth, which included the making of, or the

- 26 -

participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about LabCorp and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of LabCorp's securities during the Class Period.

53. The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

54. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LabCorp's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain

- 27 -

such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of LabCorp's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of LabCorp's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired LabCorp securities during the Class Period at artificially high prices and were damaged thereby.

56. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of LabCorp, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their LabCorp securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

58. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and

- 28 -

sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

59. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60. Each of the Individual Defendants acted as a controlling person of LabCorp within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

- 29 -

62.     As set forth above, LabCorp and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of LabCorp's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.


## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

-30-

```
Dated:  June 23, 2003
```

Respectfully submitted,
McDANIEL & ANDERSON, L.L.P.

By:
L. Bruce McDaniel
P.O. Box 58186
Raleigh, North Carolina 27658
(919) 872-3000
Fax: (919) 790-9273
N.C. State Bar No. 5025

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**
Steven G. Schulman
Andrei V. Rado
One Pennsylvania Plaza - 49th Floor
New York, NY 10119
(212) 594-5300
Fax: (212) 868-1229

--and--

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**
Maya Saxena
5355 Town Center Road, Suite 900
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**FARUQI & FARUQI, LLP**
Lubna M. Faruqi
Nadeem Faruqi
320 East 39th Street
New York, NY 10016
(212) 983-9330
Fax: (212)983-9331

**Attorneys for Plaintiff**

- 31 -

## CERTIFICATION OF STEPHEN CORT
## IN SUPPORT OF CLASS ACTION COMPLAINT

Stephen Cort ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions relating to Laboratory Corporation of America:

Purchase of 100 shares at $32 5/8 per share on 08/22/02

5.    In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs

Case 1:03-cv-00591-JAB   Document 1   Filed 06/24/03   Page 32 of 33

and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

June 16, 2003

STEPHEN CORT