# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IN RE LABORATORY CORPORATION    )
OF AMERICA HOLDINGS    )    1:03CV591
SECURITIES LITIGATION    )

## MEMORANDUM OPINION

BEATY, District Judge.

This securities fraud case is before the Court on Defendants' Motion to Dismiss [Document #27] Plaintiffs' Amended and Consolidated Class Action Complaint ("Amended Complaint") pursuant to Fed. R. Civ. P. 12(b)(6) for failure to meet the pleading requirements established by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified as amended in 15 U.S.C. §§ 78u-4, 78u-5 and other scattered sections of U.S.C.) ("PSLRA").  Lead Plaintiffs City of Sterling Heights General Employee Retirement System, City of Sterling Heights Police and Fire Retirement Act 345, John Vasey, Popano Beach Police & Firefighters' Retirement System, and Philip Mehler are purchasers of stock in Laboratory Corporation of America Holdings ("LabCorp") between February 13, 2002 and October 3, 2002 (the "Class Period").  Plaintiffs allege securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5).  Defendants in this action are LabCorp and five individuals who were the top officers of LabCorp during the relevant time period: Chief Executive Officer Thomas P. MacMahon ("MacMahon"), Chief Financial Officer Wesley Elingburg ("Elingburg"), Chief Operating Officer Richard L. Novak ("Novak"),

Executive Vice President of Public Affairs Bradford T. Smith ("Smith"), and Executive Vice President Stevan R. Stark ("Stark"). For the reasons set forth below, Defendants' Motion to Dismiss will be granted.

I.    FACTS

LabCorp is a Burlington, NC-based independent laboratory offering clinical medical tests used to diagnose, monitor, and treat patients. LabCorp, which serves clients in all 50 states, has a national network of laboratories and as of December 31, 2001, employed about 19,600 full-time equivalent employees. LabCorp has two lines of business: (1) routine testing for such medical examinations as blood chemistry analysis, urinalysis, and Pap tests ("Routine Testing") and (2) specialized esoteric and genomic testing. The Routine Testing business is fee-based, and characterized by higher volume but lower margins. The fees for this service are determined by negotiations with large contracting bodies, such as managed care organizations. The Routine Testing business accounted for a majority of LabCorp's 2001 and 2002 revenue. However, esoteric testing, which has a higher margin than Routine Testing, was considered by LabCorp as a growth driver for expansion. LabCorp's principal competitor is Quest Diagnostics, which is the largest clinical laboratory in the United States. However, LabCorp also faces competition from laboratories owned by hospitals and physicians as well as smaller regional independent laboratories.

Plaintiffs claim that during the Class Period of February 13, 2002 to October 3, 2002, Defendants falsely represented that: (1) volume growth was strong, including in Defendants'

Routine Testing business; (2) LabCorp was competing favorably with its principal competitors on pricing, accuracy, and timeliness of reporting test results, service, and reputation in the medical community; and, therefore, (3) LabCorp was well positioned in 2002 to achieve growth of 12 percent in revenues (8-9 percent volume, 3-4 percent price) and 33 percent growth in earnings. As a result of these misrepresentations, Plaintiffs allege that the price of LabCorp stock was inflated and reached a split adjusted class period high of $51.98 on May 10, 2002. Plaintiffs allege that because of this allegedly inflated price, a number of LabCorp insiders sold their stock – pursuant to pre-existing stock sales pursuant to 17 C.F.R. § 240.10b5-1("Rule 10b-5 plans") – and grossed in excess of $25 million. Additionally, LabCorp was able to use its inflated stock as currency to acquire Dynacare, Inc. ("Dynacare"), a deal that was announced in May 2002, and was paid for with a combination of stock, cash, and assumed debt.

Plaintiffs claim that, in fact, LabCorp's business was being negatively impacted by small regional competitors who were gaining a material portion of LabCorp's market share in markets where LabCorp had previously faced little to no competition. The most serious inroad was by Spectrum Laboratory Network ("Spectrum"), a regional laboratory company based in North Carolina and formed by a core group of hospitals including Moses Cone Health System. Plaintiffs allege that investors were unaware of this loss of market share, particularly in North Carolina, until October 3, 2002, when, after close of trading, LabCorp revealed that a continued slowdown in volume growth in key regions of the country resulted in a lowered third quarter results, so that LabCorp would not meet analysts' expectations for the third quarter, and that

3

the downturn in volume growth in the Routine Testing part of the business was expected to last throughout the remainder of 2002. As a result of this announcement, LabCorp stock fell 34.6 percent, from $33.18 to $21.68.

Defendants, in response, primarily argue that the allegedly false financial guidance was an attempt to project LabCorp's overall performance for the *entire* year of 2002, and not for any particular quarter or region of the country. Defendants emphasize that the announcement in October was that LabCorp was not going to meet *analysts'* revenue estimates of $664.2 million for the third quarter, not LabCorp's own estimates (which it did not give). Furthermore, Defendants state that, in fact, LabCorp had a record year in 2002, with record revenues of $2.508 billion, reflecting revenue growth in the range of 14 percent – beating LabCorp's own annual estimates that Plaintiffs allege were misleadingly high. LabCorp also achieved a testing volume increase of 10.7 percent and pricing increases of 3.3 percent.

II.     STANDARD OF REVIEW

To establish securities fraud liability under Section 10(b)[1] of the Exchange Act and Rule

---

[1]Section 10(b) provides that: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange – (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. § 78j(b).

4

10b-5,[2] a plaintiff must prove that the defendant (1) made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused plaintiff's damages. See In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 387 (4th Cir. 2005). A fact is material "if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." Id. Scienter, as applied to existing statements of fact, may be proven by either intentional misconduct or recklessness, but not mere negligence. Id.

Generally, in terms of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 998, 152 L. Ed. 2d 1 (2002) (internal quotations omitted). In making this determination, a court must view the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded allegations. Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994). However, in order to survive a motion to dismiss, a private securities fraud complaint must also be able to satisfy the heightened pleading requirements of PSLRA. In re PEC Solutions, 418 F.3d at 387 (4th Cir. 2005). Under PSLRA, the complaint must "specify each

---

[2] Rule 10b-5, promulgated under Section 10(b), further provides that: "It shall be unlawful for any person . . . [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security."

statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id.; 15 U.S.C. § 78u-4(b)(1). Furthermore, under PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." Id.; 15 U.S.C. § 78u-4(b)(2). If the complaint is insufficient on either count, the court "shall" dismiss the complaint. Id.; 15 U.S.C. § 78u-4(b)(3).

Additionally, under PSLRA, there exists a forward-looking safe harbor. Generally, this safe harbor insulates forward-looking statements, such as projections of future revenues, from liability where certain conditions apply.

> [I]ssuers and underwriters of securities shall not be liable in any private action based on an untrue or misleading statement of a material fact 'with respect to any forward-looking statement' if the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, . . . or . . . the plaintiff fails to prove that the forward-looking statement . . . [if made on behalf of a business entity by or with the approval of an executive officer was] made . . . with actual knowledge by that officer that the statement was false or misleading.

In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 211 -12 (1st Cir. 2005); 15 U.S.C. §§ 78u-5(c)(1). Thus, in contrast to statements concerning existing facts, liability under forward-looking statements only exists where that statement is not accompanied by meaningful cautionary

statements, or where a defendant has *actual* knowledge that the statement was false. Forward-looking statements under PSLRA include: "(A) a statement containing a projection of revenues, income . . . earnings (including earnings loss) per share, capital expenditures, dividends, . . . or other financial items; (B) a statement of the plans and objectives of management for future operations . . . ; (C) a statement of future economic performance . . . ; (D) any statement of the assumptions underlying or relating to [any of the above]." 15 U.S.C. §§ 78u-5(i)(1).

Defendants' Motion to Dismiss argues that Plaintiffs have failed to plead allegations of scienter with sufficient particularity. Moreover, Defendants argue that all of the statements identified by Plaintiffs are forward-looking statements and were accompanied by meaningful cautionary language. However, Defendants acknowledge that Plaintiffs specifically point to four statements as concerning existing, and not forward-looking, facts. The Court will now address these specific allegations.

III.    DEFENDANTS' ALLEGEDLY FALSE STATEMENTS

Plaintiffs challenge twenty-eight separate statements that they allege were false based upon the facts within the Amended Complaint. However, Plaintiffs have acknowledged[3] that all but four of these  statements in the Amended Complaint are forward-looking statements, and thus may be subject to the PSLRA's safe harbor if they were accompanied by meaningful, cautionary

---

[3] While Plaintiffs argue in general terms in their Response Brief to Defendants' Motion to Dismiss that the Amended Complaint is "replete with statements of existing fact," Plaintiffs in fact only point out the four statements discussed later in this Memorandum Opinion. Moreover, during a hearing in this matter held on October 21, 2005, Plaintiffs counsel acknowledged again that only these four statements contain arguably existing facts.

7

language.  The Court will now consider these statements, looking first at the forward-looking statements, both written and oral, and then at the four statements by Defendants that may concern existing facts.

A.  Defendants' Written Forward-Looking Statements

The first forward-looking statement that Plaintiffs challenge is the same statement that is challenged multiple times in the Amended Complaint, as it was repeated many times by Defendants between February and June.  On February 13, 2002, Defendants stated in their Form 8-K, that, in 2002, total revenues were expected to increase 12 percent compared to the previous year (8-9 percent volume; 3-4 percent price) and growth of 33 percent in earnings per share was forecasted after giving effect to certain changes in accounting rules.  This statement was repeated in presentations by LabCorp to analysts in March, April, May, and June.

This Form 8-K, and all subsequent challenged press releases by Defendants, included this cautionary language:

> Each of the above forward-looking statements is subject to change based on various important factors, including without limitation, competitive actions in the marketplace and adverse actions of governmental and other third-party payors.  Further information on potential factors that could affect LabCorp's financial results is included in the Company's Form 10-K for the year ended December 31, 2000 and subsequent SEC filings, and will be available in the Form 10-K for the year ended December 31, 2001, when filed.

(Index to App. to Br. Supp. Defs.' Mot. Dismiss, Document #30, No. 7.)

Plaintiffs also challenge another statement from the same day, February 13, 2002,

included by Defendants in a press release: "LabCorp's strong fourth quarter performance rounded out an impressive year of price and volume gains for the Company . . . . We achieved steady growth and exceeded our performance measures for each quarter. Our significant accomplishments include further expansion of our managed care business while strengthening our scientific expertise and market share through acquisitions and strategic partnerships." (Index to App. to Br. Supp. Defs.' Mot. Dismiss, Document #30, No. 2.) This press release also included the above cautionary language.

While Plaintiffs state that these statements are false because LabCorp was already seeing a downward trend in its Routine Testing business as of February 13, 2002, Defendants argue that these statements are both true and are forward-looking statements that were accompanied by sufficient cautionary materials. Defendants seek to rely on their standard cautionary language, as described above, as well as incorporate by reference the additional cautionary language contained in the Defendants' Form 10-K for 2000 and 2001. Defendants' Form 10-K states as follows:

> The Company has made in this report, and from time to time may otherwise make in its public filings, press releases and discussions with Company management, forward-looking statements concerning the Company's operations, performance and financial condition, as well as its strategic objectives. Some of these forward-looking statements can be identified by the use of forward-looking words such as "believes", "expects", "may", "will", "should", "seeks", "approximately", "intends", "plans", "estimates", or "anticipates" or the negative of those words or other comparable terminology. Such forward-looking statements are subject to the various risks and uncertainties and the Company claims the

9

protection afforded by the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Actual results could differ materially from those currently anticipated due to a number of factors in addition to those discussed elsewhere herein and in the Company's other public filings . . . including: . . . increased competition . . . failure to obtain and retain new customers . . . [and] ability to attract and retain experienced and qualified personnel . . .

(Index to App. to Br. Supp. Defs.' Mot. Dismiss, Document #30, No. 1 & 21.)

Because Plaintiffs have acknowledged that all but four statements in the complaint, such as those listed above, are forward-looking statements, the Court will now consider first whether Defendants' cautionary language was meaningful, and second whether it accompanied the accused statements, so as to bring the statements within the safe harbor of PSLRA.[4]

To be meaningful, cautionary language must "convey[] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." In re Humphrey Hospitality Trust, Inc. Sec. Litig., 219 F. Supp. 2d 675, 683-84 (D. Md. 2002). Put another way, meaningful cautionary language "rules out a caution such as: 'This is a forward-looking statement: caveat emptor.' But it does not rule *in* any particular caution, which always may be challenged as not sufficiently 'meaningful' or not pinning down the 'important factors that could cause actual results to differ materially' – for if it *had* identified all of those factors, it

---

[4] Accordingly, the Court will not recite all of the alleged forward-looking written statements in this Memorandum. However, the Court has examined all the alleged forward-looking statements and finds these two issues, the meaningfulness of the cautionary language and whether the language accompanied the statements, to be dispositive as to all of the statements.

10

would not be possible to describe the forward-looking statement itself as materially misleading." Asher v. Baxter Int'l Inc., 377 F.3d 727, 729 (7th Cir. 2004) (emphasis in original).

In this case, the Court finds that the cautionary language included with Defendants' disclosures was meaningful, particularly because when the statements are considered along with the cautionary language, the statements appear to be not even materially misleading. Id. The very problems that Plaintiffs identify as the actual cause of Defendants' eventual need to warn that they would not meet *analysts'* expectations for the third quarter are the same as the problems that Defendants warn of in their cautionary language. Plaintiffs complain that Defendants were in danger of losing several large contracts, and that to cut costs, Defendants cut personnel which led to service deficiencies. Defendants, in fact, warned of increased competition, of a failure to obtain and retain new customers, and cited the ability to attract and retain experienced and qualified personnel as possible reasons to suspect their forecasted annual profits. In order to be meaningful, Defendants' cautionary language need not identify specific competitors in its risk disclosures, but instead should be enough to properly warn an investor of significant risks similar to that actually realized so as to put the investor on notice. See Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999); see also Asher, 377 F.3d at 734 (stating that cautionary language is meaningful where it identifies "the principal contingencies that could cause actual results to depart from the projection"). In this case, Defendants identified the specific risks that caused their forecasts to vary. Therefore, the only question that remains as to these forward-looking statements is whether the cautionary language "accompanies" the

11

statements so as to provide the statutory safe harbor.

While the PSLRA itself makes no reference as to whether cautionary language may be incorporated by reference where the forward-looking statement is written (as opposed to an oral statement, in which the statute is clear that it may be so incorporated), several courts have addressed this topic. For example, the court in <u>In re Blockbuster Inc. Securities Litigation</u>, stated that "as long as the reference is clear and explicit so that the referenced cautionary language can fairly be viewed as part of the 'context' surrounding the written forward-looking statement, the PSLRA safe harbor for written forward-looking statements can be satisfied by meaningful cautionary language that is incorporated by reference." <u>In re Blockbuster Inc. Sec. Litig.</u>, No. 3:03-CV-0398-M, 2004 WL 884308, at *4 (N.D. Tex. April 26, 2004). Similarly, the court in <u>Asher</u> explained that where investors bring a fraud-on-the-market claim, such as the case before this Court, "[a]n investor . . . must acknowledge that all public information is reflected in the price . . . . Thus if the truth or the nature of a business risk is widely known, an incorrect statement can have no deleterious effect, and if a cautionary statement has been widely disseminated, that news too affects the price just as if that statement had been handed to each investor." <u>Asher</u>, 377 F.3d at 732. Accordingly, the Court in <u>Asher</u> found that written cautionary language may be incorporated by reference. <u>Id.</u> This Court finds no reason not to do the same. As such, Defendants' written forward-looking statements are all accompanied by

12

meaningful, cautionary language, and are therefore protected by PSLRA's safe harbor.[5]

B.  Defendants' Oral Forward-Looking Statements

As the Court previously noted, the PSLRA specifically provides for incorporating cautionary language into an oral forward-looking statement.  The statute provides that a safe harbor exists for oral statements if the statement includes language stating "that the actual results could differ materially from those projected in the forward-looking statement" and:

> (i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to differ materially from those in the forward-looking statement is contained in a readily available written document, or portion thereof; (ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and (iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 77z-2(c)(2)(B).

In this case, Plaintiffs argue that at least one of Defendants' oral forward-looking

---

[5] Because the Court has found Defendants' cautionary language meaningful and found that it accompanied, if by incorporation, Defendants' forward-looking statements, it need not consider whether Plaintiffs also failed to plead facts giving rise to a strong inference that Defendants made the statements with actual knowledge that it was false.  See 15 U.S.C. § 78u-5(c)(1)(A) & (B); see, e.g. Miller v. Champion Enters., Inc., 346 F.3d 660, 672 (6th Cir. 2003) (finding that if forward-looking statements are accompanied by meaningful cautionary language, PSLRA makes state of mind irrelevant); Theoharous v. Fong, 256 F.3d 1219, 1225 n.6 (11th Cir. 2001) (same); Blockbuster, 2004 WL 884308, at *2 (same); but see In re Seebeyond Techs. Corp. Sec. Litig., 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003).

13

statements was not accompanied by a "readily available" written document.[6] More specifically,

---

[6] Defendants' oral forward-looking statements include these statements from the Amended Complaint:

On April 24, 2002, during an interview by Bloomberg Forum of Defendant Smith, Smith stated:

> Well, we had growth in all areas of the company. But what really helped, there are two primary drivers of our revenue growth. One is our growth in our managed care business, which we continue to see healthy increases both in terms of the amount of managed care business that we get and our ability to increase the price per order or session that we get.

On April 24, 2002, during that same interview, Smith said in response to question about market reaction to first quarter earnings,

> When you look at it over a slightly longer period of time, the trend has been significantly improving. And I think based upon our optimism and what we see in connection with the trends for our company and the overall industry, clinical laboratory testing industry, I'm hopeful that the market, when you look at more than one day, that will reflect our view of the growth potential and prospects for the industry and an increase in share value.

Smith further stated during that same interview in which he suggested that growth guidance was, in fact, conservative, that

> During our earnings conference call, we did give guidance for the year, which included an increase in revenues of approximately 12 percent for 2002 compared to 2001. And that included a growth in volume of 9 percent and price of 3 to 4 percent, and an increase in EBITDA margins to 23 percent. That's about a 2 percent increase over 2001. EPS growth of 30 percent compared with 2001 using the new accounting rules. And that basically are the primary points in connection with the guidance that we've given. We also talked a lot about - that's guidance based upon current trends. But there are a number of growth opportunities that are sort of upside potential, that we didn't provide guidance in connection with

14

Plaintiffs state that forward-looking statements made by Defendants during a February 14, 2002

conference call and a statement by Defendant Smith at the SG Cowen Annual Healthcare

Conference in Boston, Massachusetts on March 13, 2002 were not protected by meaningful

cautionary language in a readily available document, because although Defendants referenced

---

> them. That includes things like new tests, growth in new test
> revenues such as cystic fibrosis, which is growing very rapidly,
> Hepatitis C testing in connection with some of the new pegilated
> interferon treatments that are available.

On July 25, 2002, during a conference call with analysts, Defendant MacMahon stated
that LabCorp was confident in their ability to grow revenues, including in the core testing
business, and said

> When I look at what is ahead for us over the next six months I
> look at strong pricing, I look at continued volume increases, I look
> at the integration of Dynacare, and I look at the most recent
> information that I have. I look at our standards compared to
> everything else that is going on in the industry, and I think it's a
> pretty good accomplishment.

Again during that same conference call, Defendant MacMahon warned that the Company
was dealing with competition in certain regions:

> In terms of our competitor response I think you have already seen
> we have announced the Premier deal. We expect during the
> second half of the year that we will strengthen ourselves in those
> regions of the country where we have identified slower volume
> growth than we would like to have by some of the points that I
> have outlined before.

Finally, still during that July 25, 2002 conference call, Defendant MacMahon reiterated
that growth in sales volume would be fine: "I know how analysts look at this, but the volume
is growing. There is not a substantial slowdown in volume. The volume is still up 7 percent,
in most areas of the country more than that. So we continue to be satisfied with that . . ."

15

their 2001 10-K, it was not, in fact, filed with the SEC until after these statements were made.

In response to this argument, Defendants state that while they referenced the 2001 10-K during these oral presentations, they also referenced: (1) LabCorp's Form 8-K that had been filed one day before the February 13, 2002 presentation; (2) the most recently filed Form 10-K from 2000; and (3) all subsequent SEC filings, including three Form 10-Qs and numerous Form 8-Ks. The Court has considered the arguments as to this matter, and finds that Defendants properly complied with the PSLRA by incorporating by reference meaningful cautionary language as to all of their oral forward-looking statements, including the statements of February 14, 2002 and March 13, 2002. While Defendants' 2001 Form 10-K may not have been "readily available" to investors at the time these statements were made, the older documents cited by Defendants included similar cautionary language. Accordingly, the Court finds that all of Defendants' oral forward-looking statements are also covered by the safe harbor of the PSLRA.

C. Defendants' Statements Of Arguably Existing Facts

Plaintiffs have also particularly challenged four statements that they allege were not forward-looking statements, but instead as Plaintiffs argue, they concerned existing facts at the time the statements were made. (See Am. Compl. ¶¶ 41, 45, 46, 65.) First, Plaintiffs point to reports by several analysts, during the February 14, 2002 earnings conference call, during which Defendants allegedly told analysts that LabCorp's contract with Mid Atlantic Medical Systems, Inc. ("MAMSI") was a driver of growth and provided opportunities for growth in 2002, and that the MAMSI contract was "extremely successful" at building LabCorp's presence in Mid-Atlantic

16

region. Plaintiffs state that this is false because LabCorp had already lost significant market share

in its Routine Testing market and had imposed a hiring freeze to curtail costs, and because

MAMSI was actually dissatisfied with LabCorp's service and LabCorp was in danger of losing

this contract.

Second, Plaintiffs point to a statement in LabCorp's Form 10-K filed with the SEC on

March 18, 2002:

> The Company believes that the following factors, among others, are often used by health care providers in selecting a laboratory: (i) pricing of the laboratory's test services; (ii) accuracy, timeliness and consistency in reporting test results; (iii) number and type of tests performed; (iv) service capability and convenience offered by the laboratory; and (v) its reputation in the medical community. **The Company believes that it competes favorably with its principal competitors in each of these areas and is currently implementing strategies to improve its competitive position.**
>
> The Company believes that consolidation will continue in the clinical laboratory testing business. In addition, **the Company believes that it and the other large independent clinical laboratory testing companies will be able to increase their share of the overall clinical laboratory testing market** due to a number of external factors including cost efficiencies afforded by large-scale automated testing. Medicare reimbursement reductions and the growth of managed health care entities, which require low-cost testing services and large service networks. In addition, legal restrictions on physician referrals and the ownership of laboratories as well as increased regulation of laboratories are expected to contribute to the continuing consolidation of the industry. (emphasis added by Plaintiffs)

(Index to App. to Br. Supp. Defs.' Mot. Dismiss, Document #30, No. 1.) Plaintiffs argue that this

statement is false because, at the time, Defendants were not "compet[ing]" favorably" with their

primary competitors.

Third, Plaintiffs cite a March 29, 2002 letter to shareholders written by Defendant MacMahon that was mailed to shareholders and also filed with the SEC. In the letter, MacMahon wrote:

> As LabCorp enters 2002, **our competitive position has never been stronger** . . . . Beyond the promise of genomics and molecular testing, LabCorp is fortunate to have numerous additional upside opportunities. Increased market share, particularly in the managed care sector, is one of them. Despite our recent gains in managed care testing, most of the opportunity for growth in this market remains ahead of us. This includes testing with the three national managed care providers with whom we currently have multi-year agreements. As a result, the potential to expand service to these key providers is significant. (emphasis by Plaintiffs.)

(Index to App. to Br. Supp. Defs.' Mot. Dismiss, Document #30, No. 24.) Similar to the statement in the Form 10-K, Plaintiffs state that this statement in MacMahon's letter was materially false and misleading when made because Defendants knew that LabCorp was not competing favorably with its principal competitors, and significant contracts were in jeopardy of being lost.

Fourth, and finally, Plaintiffs point to a statement made by Defendant MacMahon during a conference call on July 25, 2002, which occurred after LabCorp had restated and revised upward its guidance figures.[7] During that call, MacMahon states that sales volume growth has

---

[7] Defendants, on July 24, 2002, revised the guidance estimates in their Form 8-K upward to reflect a purchase of another company, Dynacare. The new guidance called for revenue growth of about 15.5 percent to 16.5 percent as compared to 2001 (attributable to a 12 percent

18

slowed in unidentified regions of the country, but that other regions show solid growth. He

attributes slower growth to delays in closing deals, including a contract with Premier, Inc.

("Premier") and states,

> The question is can you shed some more information on what
> happened in certain regions. I guess my answer is that Bill, there
> were some regions that were disproportionally impacted by our
> inability to finalize the Premier deal as well as some other big
> deals. The fact is that there were some smaller labs out there that
> really hurt us in several regions of the country. Now what are we
> going to do about that? The first thing we are going to do when we
> begin is we have got the Premier deal done. That does impact in
> certain regions in a greater way than other regions. We are putting
> great emphasis in getting some of these other deals done.
> Secondly, we had developed plans to more effectively compete
> with these smaller lab providers, which include highlighting the
> advantages of our genomic strategy, differentiating ourselves in the
> esoteric area, and developing plans to be more effective from a sales
> perspective in a couple of these regions.

(Index to App. to Br. Supp. Defs.' Mot. Dismiss, Document #30, No. 12.) Plaintiffs argue that

this statement is materially misleading because Defendants knew the slow down was not due to

delay in closing deals, but was in fact the result of increased competition from LabCorp's

competitors. Because the accuracy of these statements could have been determined at the time

they were made, Plaintiffs argue that Defendants are not protected by the safe harbor provision

of PSLRA as to forward-looking statements. See Friedman v. Rayovac Corp., 295 F. Supp. 2d

---

growth in volume and 4 percent increase in price; adjusted EBITDA margins of about 23 percent
of sales; EPS in the range of $1.90 to $1.95. Also, for 2003, LabCorp projected a revenue growth
of 16-17 percent compared to 2002, adjusted EBITDA margins of about 24-24.5 percent of sales,
and EPS growth of about 25-30 percent compared to 2002.

957, 989 (W.D. Wis. May 29, 2003).

In response, Defendants argue that, in fact, these four statements are forward looking and therefore are also covered by the PSLRA's safe harbor. However, were the Court to see them not as forward-looking statements, but instead as statements concerning existing facts, Defendants go on to argue three other points: first, that Plaintiffs do not properly allege that these statements actually were false when made, second, that Plaintiffs' allegations have failed to raise a "strong inference" of scienter as required by PSLRA, and third, that under established Fourth Circuit law, these statements are not material so that a reasonable investor would actually rely on the statements.

It is well established that in order to state a claim under the Securities Act, the allegedly fraudulent statements must be material in order to meet pleading standards. See In re Cable & Wireless, PLC, Sec. Litig., 332 F. Supp. 2d 896, 900 (E.D. Va. 2004). A fact (or omission) is material "if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." Id.; see also Longman v. Food Lion, Inc., 197 F.3d 675, 683 (4th Cir. 1999). However, statements that consist of nothing more than indefinite statements of corporate optimism, also known as "puffery," are immaterial as a matter of law. See Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993). Put another way, a statement is likely immaterial, as a matter of law, if it is "a certain kind of rosy affirmative commonly heard from corporate

20

managers and familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." <u>In re Cable & Wireless</u>, 332 F. Supp. 2d at 900.

As an example of the difference between a material statement of fact and one of mere puffery, the Court notes that the Fourth Circuit Court of Appeals found statements in <u>Dunn v. Borta</u>, 369 F.3d 421 (4th Cir. 2004) to go *beyond* mere puffery and become material where the statements at issue were "specific factual allegations" that were "not simply sales pitches but rather can be proven true or false – and, if properly supported, could be found material by a reasonable jury." <u>Id.</u> at 431. In <u>Dunn</u>, a case involving arcade game platforms, those statements concerned such things as misrepresentations about the exact number of units sold, whether other companies were designing products for the gaming platform at issue, whether a product would be introduced at a specific time, and whether the company was negotiating with a specific manufacturing facility to handle overflow production. <u>Id.</u> In contrast to such specific, readily provable statements at issue in <u>Dunn</u>, an example of the opposite kind was revealed in the case of <u>In re Cable & Wireless</u> where the court concluded that a number of statements, alleged by plaintiffs to be false, consisted of little more than inactionable puffery or corporate optimism. These statements included: "these results demonstrate healthy growth and exceptionally strong finances"; "we are achieving our objectives . . . [defendant's] unique financial strength is a fundamental advantage as the shakeout in our sector continues"; "our current strong net cash

position of £2.2 billion remains a source of competitive advantage with our corporate customers"; "results are in line with our expectations"; "Revenues . . . have continued to grow . . ." In re Cable & Wireless, 332 F. Supp. 2d at 901.

The Court finds that the statements at issue in In re Cable & Wireless that were found to be inactionable puffery are similar to several of the statements at issue here. The second and third of the four statements challenged by Plaintiffs particularly consist of soft, puffing statements that cannot possibly be considered material. The statement, "The Company believes that it competes favorably with its principal competitors in each of these areas and is currently implementing strategies to improve its competitive position," is no different than the statements considered to be puffery in In re Cable & Wireless that "these results demonstrate healthy growth and exceptionally strong finances." It is not at all similar to the statement cited by Plaintiffs in In re Lucent Technologies Securities Litigation to be an actionable statement of existing fact concerning whether Lucent's optical networking business was growing at the same rate as market, 40 to 50 percent. See In re Lucent Techs. Sec. Litig., 217 F. Supp. 2d 529, 557 (D.N.J. 2002). Accordingly, the Court finds that the statement by Defendants concerning "compet[ing] favorably" that Plaintiffs allege to be a violation of the securities laws cannot be so, because it is complete puffery. Liability for the third statement, also given by Defendants in March, that "our competitive position has never been stronger," must be rejected for the same reason as the second statement about "compet[ing] favorably." See Raab, 4 F.3d at 289 (statement that "the DOE Services Group is poised to carry the growth and success of 1991 well

22

into the future" properly dismissed as puffery). This statement about Defendants' "competitive position" is so loose, vague, and lacking in specificity that it cannot be material.[8]

As to other of the four statements, it appears that Plaintiffs have failed to properly plead that Defendants knew the statements were false when they made the statements. See In re CornerStone Propane Partners, L.P., 355 F. Supp. 2d 1069, 1085 (N.D. Cal. 2005) (dismissing some allegations in securities complaint where allegations and statement made by defendant are not inconsistent, thus complaint does not adequately plead falsity); see also Humphrey Hosp. Trust, Inc. Sec. Litig., 219 F. Supp. 2d 675, 682 (D. Md. 2002) ("To satisfy the requirements of Rule 9(b) [of the Federal Rules of Civil Procedure] as to falsity, a section 10(b) plaintiff must . . . specify the statements that the plaintiff contends were fraudulent . . . and explain why the statements were fraudulent."). First, the Court notes that the purported comment by Defendants that the MAMSI contract was "extremely successful" appears not to have actually been made. See Steckman v. Hart Brewing, 143 F.3d 1293, 1295-96 (9th Cir. 1998) (stating that

---

[8] Moreover, the Court notes that Plaintiffs have failed to show that these statements were actually false. While Plaintiffs point to a number of areas or contracts in which Defendants were losing business at the time these statements were made, Plaintiffs point to no specific facts showing that the overall company was losing market share or failing to compete favorably against all of LabCorp's many competitors. In fact, after Defendants made this statement in March of 2002, they reported record high second quarter earnings of 25.5 percent of net sales on July 24, 2002. "To state, in retrospect, that a company could have done better is not the same as alleging that positive statements were false when made. . . . Put another way, a company can accurately state that its products are competitive, and proclaim that it believes its fortunes are heading in the right direction, even if the company's competitors have higher market share or profit margins." In re Nokia Oyj (Nokia Corp.) Sec. Litig., No. 04-CV-2646, 2006 WL 851155, at *27 (S.D.N.Y. Mar. 31, 2006).

23

courts are not "required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.") From a review of the transcript of that February 14, 2002 conference call, the Court found only a statement by Defendant MacMahon that "[w]e continue to develop our relationship with Malmsey [sic], a significant new managed care customer located in the Mid-Atlantic area." (Index to App. to Br. Supp. Defs.' Mot. Dismiss, Document #30, No. 23.) Accordingly, if analysts happened to have taken an account of Defendant MacMahon's statements and concluded that the contract with MAMSI was "extremely successful," such a showing by Plaintiffs does not make Defendants liable for the analysts' statements. See In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 889 (W.D.N.C. 2001) ("[L]iability may not be based on statements in analyst reports unless plaintiffs allege facts to establish that a specific false statement was actually made by a defendant or that the content of the analyst's report was controlled by the defendant.") (citing Raab, 4 F.3d at 288 (4th Cir. 1993)). In this case, Plaintiffs have failed to show that any of Defendants actually claimed that the MAMSI contract was "extremely successful" or that any of the Defendants controlled the content of the analysts' reports.

The Court finds that Plaintiffs have also failed to plead falsity with particularity as to the fourth and final statement at issue, which concerns a July 2002 conference call in which Defendant MacMahon stated that "volume is growing. There is not a substantial slowdown in volume. The volume is still up 7 percent, in most areas of the country more than that . . ." and that "there were some regions that were disproportionally impacted by our inability to finalize

24

the Premier deal as well as some other big deals." (Index to App. to Br. Supp. Defs.' Mot. Dismiss, Document #30, No. 12.) Plaintiffs argue that these statements were false because LabCorp had been losing business to Spectrum, and that the Premier deal did not impact LabCorp's volume growth. However, the Court finds that Plaintiffs have failed to allege facts sufficient to show that LabCorp's overall volume growth was not increasing in July 2002 or that the delay in the Premier deal was not adversely impacting some regions. See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("[P]laintiffs must do more than say that . . . statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."). For example, the Court notes that during the telephone conference with analysts on July 25, 2002, Defendant MacMahon stated that volume growth during the second quarter increased at a rate of 7 percent. He then noted that he had hoped it would have increased at a rate of 8-8.5 percent, but that volume increases had fluctuated between 6 percent and 10 percent. (Index to App. to Br. Supp. Defs.' Mot. Dismiss, Document #30, No. 12.) Plaintiffs have not alleged that this specific statement, which could be proven unlike many other allegations within the Amended Complaint, was false. Therefore, Plaintiffs have not shown why the fact that Defendants may have stated that "volume is growing" is a false statement.[9] Accordingly, Plaintiffs have failed to properly plead falsity, and therefore, Plaintiffs' claims pursuant to Section 10(b) must fail.[10]

_____

[9] In fact, the Court notes that Defendants reported on February 18, 2003 that year end results from 2002 showed an overall volume increase of 10.7 percent.

[10] Because the Court has considered each of the existing fact statements by Defendants that Plaintiffs argue are false and found all the statements to be either not material or that

25

Similarly, because Plaintiffs' Section 20(a) claims are purely derivative of their Section 10(b)

claims, those claims must also fail. See In re Visual Networks, Inc. Sec. Litig., 217 F. Supp. 2d

662, 670 (D. Md. 2002) (holding that a claim for a primary securities fraud violation precludes

a finding of control person liability).

IV.     CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs have failed to meet the

rigorous pleading standards required by PSLRA, and that, as noted by the Court, much of the

Amended Complaint at issue contains forward-looking statements protected by PSLRA's safe

harbor.  Accordingly, the Court will GRANT Defendants' Motion to Dismiss [Document #27].

An Order and Judgment consistent with this Memorandum Opinion will be filed

---

Plaintiffs failed to plead falsity with particularity, the Court need not consider Defendants'
alternative arguments against liability.  However, the Court has also considered Defendants'
arguments concerning scienter and finds that Plaintiffs have also failed the pleading standard in
this regard.   As previously discussed, under the PSLRA, a complaint must "state with
particularity facts giving rise to a strong inference that [each] defendant acted with the required
state of mind."  15 U.S.C. § 78u-4(b)(2).  The required state of mind is either intentional
misconduct or recklessness, but not mere negligence. Id.  The Fourth Circuit Court of Appeals
has instructed that courts should not restrict this scienter inquiry "by focusing on specific
categories of facts, such as those relating to motive and opportunity, but instead should examine
all of the allegations in each case to determine whether they collectively establish a strong
inference of scienter."  See Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 345 (4th
Cir. 2003).  The Court has examined all of the allegations in this case and finds that Plaintiffs'
allegations regarding the existence of internal reports concerning the impact of Spectrum on
LabCorp's business does not show that each Defendant knew their overall guidance was wrong,
or when each Defendant knew the guidance was wrong.  Moreover, Plaintiffs allegations
regarding stock sales pursuant to pre-existing Rule 10b5-1 plans and the purchase of Dynacare
where a relatively small component of the transaction is in stock, do not add to the scienter
analysis in any meaningful way.  Pleading fraud by hindsight is therefore not permitted.  See In
re Silicon Graphics Sec. Litig., 183 F.3d 970, 988 (9th Cir. 1999).

26

contemporaneously herewith.

This, the 18th day of May, 2006.

_____
United States District Judge